## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **HENRY T. JOHNSON #00459481,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:18-cv-00539** |
| | ) | **Judge Trauger** |
| **KEVIN GENOVESE,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Henry Johnson, a pro se state prisoner, filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 1), to which the respondent filed an answer (Doc. No. 17), to which the petitioner filed a reply (Doc. No. 22). The Petition includes a request for the appointment of counsel. (Doc. No. 1 at 15.) For the following reasons, the petitioner is not entitled relief under Section 2254, his request for counsel will be denied, and this action will be dismissed.

## I.    Procedural Background

In August of 2007, a Montgomery County grand jury indicted the petitioner for first-degree murder, felony murder, aggravated burglary, and possession of a firearm in furtherance of a felony. (Doc. No. 16-1 at 4–5.) The state moved to dismiss the firearm-possession count, and the case proceed to trial on the first three counts. (Doc. No. 16-2 at 16.) At trial, the court granted the petitioner's motion for a judgment of acquittal regarding the felony-murder count. (Doc. No. 16-4

---

[1] Because the petitioner in custody under a state court judgment, the proper respondent is the warden at his current place of confinement, Northwest Correctional Complex. (Doc. No. 23 at 2.) *See* Habeas Rule 2(a); (Doc. No. 23 at 2.) The court takes judicial notice that the warden of this facility is Kevin Genovese. *See* Northwest Correctional Complex, TENNESSEE DEPARTMENT OF CORRECTION, https://www.tn.gov/correction/sp/state-prison-list/northwest-correctional-complex (last visited June 18, 2021). This caption reflects the proper respondent to this case, and the Clerk will be directed to update the docket accordingly in the accompanying order.

at 74–92, 95–96.) The jury then found the petitioner guilty of first-degree murder and aggravated burglary. (Doc. No. 16-1 at 35, 50.) The court sentenced the petitioner to an effective sentence of life imprisonment. (*Id.*)

The petitioner filed a pro se petition for a writ of habeas corpus relief in the Lake County Circuit Court. *See Johnson v. Parker*, No. W2010-00563-CCA-R3-HC, 2010 WL 4882605, at *1 (Tenn. Crim. App. Nov. 30, 2010). The court summarily dismissed it, the Tennessee Court of Criminal Appeals (TCCA) affirmed, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. *See id.*, *perm. app. denied* Apr. 13, 2011.[2]

The petitioner also filed a direct appeal in which he was represented by counsel. (Doc. No. 16-7 (direct appeal brief).) The TCCA affirmed the judgments, and the Tennessee Supreme Court denied discretionary review. *State v. Johnson*, No. M2010-02452-CCA-R3-CD, 2012 WL 1071809 (Tenn. Crim. App. Mar. 28, 2012), *perm. app. denied*, May 16, 2012.

The petitioner filed a pro se petition for post-conviction relief. (Doc. No. 16-12 at 5–34.) The post-conviction court appointed counsel (*id.* at 40–41, 50–51), and counsel filed an amended petition. (*Id.* at 56–59.) The court held an evidentiary hearing (Doc. No. 16-13) and denied relief. (Doc. No. 16-12 at 104–26.) The TCCA affirmed, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. *Johnson v. State*, No. M2016-00820-CCA-R3-PC, 2017 WL 809883 (Tenn. Crim. App. Mar. 1, 2017), *perm. app. denied*, June 7, 2017.

The petitioner filed a pro se motion to reopen the post-conviction proceeding (Doc. No. 16-25 at 15–23, 63–135), as well as a pro se "Writ of Mandamus." (*Id.* at 28–35.) The trial court denied each filing in separate orders. (Doc. No. 16-21 (request to reopen); (Doc. No. 16-20 (motion

---

[2] The respondent does not acknowledge this state habeas corpus proceeding (*see* Doc. No. 17), but a copy of the TCCA opinion is attached to the direct appeal brief that is part of the state court record. (*See* Doc. No. 16-7 at 24–25).

2

for writ of mandamus).) The TCCA dismissed the petitioner's attempt to appeal these orders (Doc.

No. 16-23), and the Tennessee Supreme Court denied discretionary review. (Doc. No. 16-29.)

## II. Factual Background

"This case arises from the shooting and killing of the victim, Michael Zabik, on March 15,

2007." *Johnson*, 2017 WL 809883, at *1. The TCCA summarized the evidence presented at trial,

and the court will provide that summary here as context for the petitioner's claims:

> [A]round 7:30 p.m., Anthony Thomas and Brian Spencer were at Brian's sister's apartment at 101 B Chapel Street. The men heard a knock on the front door and a "commotion" outside. The sister asked who was at the door, and the victim, who lived nearby, identified himself. Brian and Thomas heard someone outside say, "I'm not going to keep telling you about my shit." Brian recognized the voice as the [Petitioner's]. Thereafter, the men heard a single gunshot. Brian opened the door, and the victim "fell in" the apartment. Brian saw someone run away but could not identify the person because it was dark.
>
> Walter Spencer, Brian's brother who lived next door at 101 A Chapel Street, heard the gunshot and went to his sister's apartment to make sure she was okay. He saw the victim lying on the floor "with a hole in his stomach," and he was moaning and bleeding. The men gathered around and asked the victim who shot him. The victim replied, "Kojack," which was the [Petitioner's] nickname. The sister called 911 to report the shooting, and emergency medical services (EMS) and law enforcement responded within minutes.
>
> Agent Gregory Beebe, a narcotics agent with the Clarksville Police Department Major Crimes Unit, was the first officer to respond to the scene. He saw the victim lying just inside the front door of the apartment. The victim was moaning and rocking back and forth. Agent Beebe saw a red, wet spot in the center of the victim's chest. Agent Beebe asked the victim who shot him, and the victim said, "Kojack." Detective David R. Galbraith arrived in time to hear the victim name the [Petitioner] as his assailant.
>
> When Montgomery County Emergency Medical Technician Larry Nolan arrived at the apartment, he immediately noticed that the victim was in critical condition. The victim had been shot in the chest, lost a great deal of blood, and complained of difficulty breathing. The EMS workers placed the victim in the ambulance and transported him to the hospital. When they neared the hospital, the victim's condition started "rapidly deteriorating." He became agitated and repeatedly said that he did not want to die. As the ambulance pulled up to the hospital, EMS workers performed chest compressions to try to increase the victim's heart rate.

Shortly after the victim was transferred to the emergency room, he went into cardiac arrest and died.

Medical Examiner Adele Lewis performed the autopsy of the victim. She determined that the cause of death was a gunshot wound to the torso; the bullet entered just below the left nipple and traveled to the right, downward, and toward the back of the body. The bullet fractured two ribs on the left side and injured the liver and gall bladder. The bullet also injured the vena cava, a major blood vessel that drains blood from the abdomen. Dr. Lewis described the injury to the vena cava as "more often th[a]n not a devastating injury." She estimated that someone with that type of injury could possibly remain conscious for "an hour or two."

Police examined the scene at 101 B Chapel Street and the victim's residence at 2112 North Ford Street, which were approximately twenty to twenty-five yards from each other. Detective Galbraith noticed that the victim's front door had been kicked open; three partial shoe prints were left on the door, and the door jamb was damaged. Testing revealed that the shoe prints were made by the [Petitioner's] shoes. Detective Galbraith said that the victim's apartment appeared to have been "ransacked."

Police arrested the [Petitioner] the day after the shooting. Lieutenant David Crockarell, one of the arresting officers, noticed that the [Petitioner] had a "very fresh haircut" and that the appellant's hair was "short . . . almost shaved."

After waiving his *Miranda* rights, the [Petitioner] initially denied any knowledge of the shooting. However, when he was advised that he had been identified as the shooter, the [Petitioner] said that he shot the victim because the victim was "disrespecting" him. The [Petitioner] said that he was homeless and that the victim allowed him to stay at the victim's apartment while he looked for a place to live. The [Petitioner] found a place but could not move in until April. When the [Petitioner] started moving his belongings out of the victim's residence, he noticed that some of his things were missing. He confronted the victim, who stated that he would get the items back for the appellant the following day. However, he never did. The [Petitioner] said that on the day of the shooting, he went to the victim's house to get the rest of his belongings, including a PlayStation which he planned to sell to a friend. The [Petitioner] said that the victim would not open the door, so the [Petitioner] kicked it open to retrieve his belongings. The victim started calling the [Petitioner] derogatory names and asserted that he would not give the [Petitioner] his PlayStation because the [Petitioner] had damaged the door. The [Petitioner] told police, "It was disrespect to me. He act like he had a gun like he was going to shoot me, but he was too slow, and then it happened." The [Petitioner] said the shooting happened after he and the victim walked to Chapel Street. The [Petitioner] disclosed that he hid the gun under a shed behind a house on E Street. Police found the rifle at the place the [Petitioner] described.

The [Petitioner] also told police that after the shooting, Angela Pittman picked him up "near Royal King." Pittman confirmed that the [Petitioner] asked her to pick him up at the end of E Street and that the [Petitioner] spent the night at her residence. Pittman said the [Petitioner's] demeanor "was [the] same as always," and he showed no indication that something bad had happened. The [Petitioner] shaved his head while at Pittman's house.

Police tested the [Petitioner] and his clothes for gunshot residue. No residue was found on the [Petitioner's] clothes. Tennessee Bureau of Investigation (TBI) Agent Laura Hodge, who analyzed the gunshot residue kit taken from the [Petitioner], stated that the "[e]lements indicative of gunshot residue were absent." She explained that due to the fragility of gunshot residue, "[t]hese results cannot eliminate the possibility the [Petitioner] could have fired, handled or was near a gun when it fired." She stated that the results can be affected by the length of time between the event and testing. The [Petitioner's] hands were tested two and one half hours after the shooting,[3] and his clothes were tested the day after the shooting.

Walter Spencer testified that on March 12 or 13, 2007, he was driving to the store with his three children and the victim. The victim was riding in the passenger seat and the three young children were in the backseat. As Walter turned onto E Street, the [Petitioner] waved for Walter to stop the vehicle. The [Petitioner] approached the passenger side of the vehicle and told the victim, "I want my shit or I'm going to kill you." The victim responded, "I'm not giving you anything." Walter drove away, not wanting his children exposed to further confrontation.

The [Petitioner], who acknowledged that his nickname was "Kojack," testified that on the day of the shooting, he went to the victim's home to retrieve some items he had stored there until he could move into a new residence. The [Petitioner] removed some of his belongings, including a rifle, from a shed behind the victim's residence. Other items were located in the residence, so the [Petitioner] went to the back door. The [Petitioner] knocked several times, but there was no answer. The door was locked, and the [Petitioner] did not have a key.

The [Petitioner] went around to the front door, taking his belongings with him. He looked in the victim's bedroom window and saw that the victim was sleeping. The [Petitioner] knocked on the front door to rouse the victim, but the victim did not answer the door. The [Petitioner] kicked the door, attempting to wake the victim, and the door "came open." The victim came to the door, asking why the [Petitioner] had kicked the door. The [Petitioner] replied that it was an accident and that he would pay to have the door repaired. The [Petitioner] asked the victim to go with him to retrieve the [Petitioner's] DVD player and PlayStation that the victim had "loaned out."

---

[3] The trial transcript reflects that Hodge testified that swabs of the petitioner's hands were taken "approximately 21-and-a-half hours" after he was suspected of firing a weapon. (Doc. No. 16-3 at 85.)

The [Petitioner] and the victim started walking toward Chapel Street; the [Petitioner] was carrying his rifle in his hand, pointing it downward. The [Petitioner] asked what was bothering the victim, and the victim told the [Petitioner] that it was none of the [Petitioner's] business. The [Petitioner] replied, "I ain't going to have you talking to me like of some kind of child." The [Petitioner] told the victim that he was upset that the victim had loaned his property in order to get drugs without the [Petitioner's] permission. The [Petitioner] said that the victim then "ma[d]e a move" and that the [Petitioner] threw up his hand to avoid being hit in the face. The victim hit the [Petitioner's] arm, causing the [Petitioner] to lose his grip on the rifle. The [Petitioner's] finger accidentally caught the trigger, and the rifle fired. The victim grabbed his left side, and the [Petitioner] ran away. The [Petitioner] said that he felt bad and that he did not intend to shoot the victim.

Sometime after the shooting, the [Petitioner] asked someone whether a warrant had been issued for his arrest, and he was told that he was wanted for homicide. The [Petitioner] said that he "prepared for jail; I cut my braids off, because I knew I didn't have no one to do my hair [in jail.]" Shortly thereafter, the [Petitioner] was arrested.

The [Petitioner] said that he initially denied any knowledge of the shooting because he was "a little confused." He denied telling police that he shot the victim because the victim disrespected him, explaining that he meant to say that the victim had been disrespectful by loaning the [Petitioner's] property without permission.

The [Petitioner's] former mother-in-law, Patricia Mize, testified that the [Petitioner] was a truthful person and that he took care of his children. Mize acknowledged that she was unaware that the [Petitioner] owned a gun.

*Johnson*, 2017 WL 809883, at *1–3 (quoting *Johnson*, 2012 WL 1071809, at *1–4).

## III.    Asserted Claims

The Petition incorporates nearly 500 pages containing numerous additional claims and voluminous supporting documentation. (Doc. No. 1 at 16–496.) The petitioner clearly labels each separate ground for relief within this lengthy filing, but upon close review, many of the grounds are overlapping or labelled in a manner that is unclear. Therefore, the court has liberally construed the Petition and the attachment to assert the following claims—renamed, renumbered, and reorganized for clarity.

1. The trial court erred in four ways:

A. Appointing an unskilled, inexperienced attorney for the petitioner (Doc. No. 1 at 474–75);

B. Admitting an incomplete prior statement by state witness Walter Spencer (*id.* at 379–80, 429–30);

C. Constructively amending the indictment (*id.* at 417–18); and

D. Failing to find that the dismissal of the felony-murder count through a motion for judgment of acquittal required the dismissal of the first-degree murder and aggravated burglary counts. (*Id.* at 423.)

2. The state committed prosecutorial misconduct in three ways:

A. Knowingly withholding exculpatory medical records (*id.* at 388–90, 493[4]);

B. Knowingly presenting false testimony on the location and size of the victim's wound (*id.* at 352–53); and

C. Failing to complete the record on direct appeal by not submitting the victim's medical records or the complete statement of state witness Walter Spencer. (*Id.* at 482, 486–87.)

3. There is insufficient evidence to support the petitioner's convictions. (*Id.* at 16–18.)

4. The petitioner suffered a violation of the prohibition on double jeopardy. (*Id.* at 23–25.)

5. Pre-trial counsel, Charles Bloodworth, was ineffective in four ways by failing to:

A. File a motion for discovery (*id.* at 273);

B. File a motion for exculpatory information (*id.* at 302);

C. Investigate the victim's clothing (*id.* at 306–07); and

D. Communicate with the petitioner. (*Id.* at 309.)

6. Trial counsel, Joel Wallace, was ineffective in eleven ways by failing to:

A. Inform the court that he was ineligible to represent the petitioner (*id.* at 30–31);

B. File a motion for a bill of particulars (*id.* at 37);

C. File a motion for discovery (*id.* at 38);

---

[4] The court considers the petitioner's general claim of "fail[ure] to provide" unspecified "discovery upon request" (*see* Doc. No. 1 at 493) subsumed into his more specific claim of "failure to disclose exculpatory evidence." (*See id.* at 388–90.)

7

D. Review and provide discovery materials to the petitioner (*id.*);

E. Investigate evidence related to the victim's wound (*id.* at 66, 82, 100);

F. Investigate and obtain the victim's medical records to prepare for trial (*id.* at 95);

G. Use the victim's dying declaration to support the petitioner's defense (*id.* at 87);

H. Properly cross-examine state witnesses (*id.* at 99);

I. Call witnesses at trial to elicit testimony regarding the victim's injury (*id.* at 113–14);

J. Object to the constructive amendment of the indictment (*id.* at 397–98, 404–05); and

K. Object to the admission of an incomplete prior statement by state witness Walter Spencer. (*Id.* at 407–08.)

7. Post-trial counsel, Gregory Smith, was ineffective by failing to preserve the following four issues for direct appeal by omitting them from the motion for new trial:

A. The state's commission prosecutorial misconduct by withholding exculpatory evidence (*id.* at 199);

B. The trial court's error of constructively amending the indictment (*id.* at 215);

C. The state's commission of prosecutorial misconduct by omitting or redacting an exculpatory portion of the statement of state witness Walter Spencer (*id.* at 220); and

D. The state's failure to provide discovery before trial. (*Id.* at 226.)

8. The post-conviction trial court erred by denying the petitioner's following motions:

A. The motions to compel subpoena responses (*id.* at 435–36);

B. The motion to exhume the victim's body (*id.* at 459–60); and

C. The oral motion for a continuance of the evidentiary hearing. (*Id.* at 469.)

9. Post-conviction counsel, Allan Thompson, was ineffective in eleven ways by failing to:

A. Subpoena and interview witnesses before the evidentiary hearing (*id.* at 147–48, 154);

B. Investigate and present evidence regarding the victim's clothing at the evidentiary hearing (*id.* at 162, 181, 183);

C. Obtain and present exculpatory medical records at the evidentiary hearing (*id.* at 167);

8

D. Investigate and present statements at the evidentiary hearing to corroborate Petitioner's trial testimony (*id.* at 169, 180);

E. Raise a claim that the state committed prosecutorial misconduct by knowingly withholding exculpatory evidence (*id.* at 139, 145);

F. Raise a claim that pre-trial counsel was ineffective for failing to file pre-trial motions (*id.* at 121–22);

G. Investigate and raise a claim that trial counsel was not qualified to represent the petitioner (*id.* at 186–88);

H. Raise a claim that trial counsel was ineffective for failing to request a jury instruction for the lesser included offenses of first-degree murder (*id.* at 192–93);

I. Raise a claim that post-trial counsel was ineffective for failing to preserve the issue of the trial court constructively amending the indictment (*id.* at 137);

J. Raise a claim that post-trial counsel was ineffective for failing to preserve the issue of the state withholding exculpatory evidence (*id.* at 123); and

K. Raise a claim that post-trial counsel was ineffective for failing to argue on direct appeal that the state committed prosecutorial misconduct by failing to submit the complete statement of state witness Walter Spencer to the TCCA. (*Id.* at 138.)

10. The petitioner is actually innocent based on two groups of newly discovered evidence:

A. Forensic reports received from trial counsel in July 2016 (*id.* at 316); and

B. Information that trial counsel was unqualified to represent the petitioner received in November 2016. (*Id.* at 345–46.)

## IV.    **Legal Standard**

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 102. Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State-court factual determinations are only unreasonable "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was

10

'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

The demanding review of claims rejected on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

The procedural default doctrine is "an important 'corollary' to the exhaustion requirement," under which "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). To establish prejudice, "a petitioner must show not merely that the errors at his trial

11

created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## V. Analysis

The respondent contends that the petitioner's claims should be denied as procedurally defaulted or meritless (Doc. No. 17 at 1), either because they were properly adjudicated on the merits in state court (*id.* at 1–12, 15–18) or are not cognizable grounds for relief under Section 2254. (*Id.* at 14, 23–24.) The court agrees.

### A. Non-Cognizable Claims

The court can grant a state prisoner's request for habeas relief "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Therefore, a ground for relief that does not assert a violation of federal law is "outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citations omitted)). Claims 8, 9, and 10 will be denied for this reason.

#### 1. Claim 8—Post-Conviction Proceedings

In Claim 8, the petitioner asserts that the post-conviction trial court erred by denying his motions. As explained by the Sixth Circuit, however, "habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854–55 (6th Cir. 2017) (quoting *Greer v. Mitchell*, 264 F.3d 663, 681

12

(6th Cir. 2001)). That is "because 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Cress*, 484 F.3d at 853 (quoting *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)). "[A]ttacks on post-conviction proceedings," meanwhile, "'address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration,'" *Leonard*, 846 F.3d at 855 (quoting *Kirby*, 794 F.2d at 247), even though "'the ultimate goal in' a case alleging post-conviction error 'is release from confinement.'" *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 248). Claim 8, therefore, does not present a cognizable basis for federal habeas relief.

### 2.    Claim 10—Actual Innocence

In Claim 10, the petitioner asserts that two groups of newly discovered evidence support of his request for habeas corpus relief. (Doc. No. 1 at 10, 315.) The court construes this as a claim of actual innocence. *See Smith v. Nagy*, 962 F.3d 192, 207 (6th Cir. 2020) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)) ("The Supreme Court has defined a freestanding actual innocence claim as one that 'argues that [the petitioner] is entitled to habeas relief because newly discovered evidence shows that [the petitioner's] conviction is factually incorrect.'"). The Sixth Circuit has "repeatedly indicated" that freestanding actual innocence claims "are not cognizable on habeas" review. *Id.* (citing *Cress*, 484 F.3d at 854). Accordingly, Claim 10 must be denied.

"[A] proper showing of actual innocence" may nonetheless allow "a prisoner whose claim may otherwise be barred by various federal or state procedural rules" to "'have his federal constitutional claim considered on the merits.'" *Penney v. United States*, 870 F.3d 459, 462 (6th Cir. 2017) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)). But this gateway to review "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at

394–95 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). A petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Schlup*, 513 U.S. at 324).

Here, the petitioner may not rely on either group of new evidence to obtain review of his procedurally defaulted claims. The first group, referenced in Claim 10.A, consists of discovery materials that the petitioner's post-conviction counsel received from trial counsel in July 2016. (Doc. No. 1 at 316.) This includes: the victim's autopsy report and accompanying medical examiner report (*id.* at 319–26), the victim's post-mortem blood test (*id.* at 327–28), several TBI reports (*id.* at 329–41), and a firearm trace summary. (*Id.* at 342.) The petitioner seems to contend that his failure to be made aware of these materials before July 2016 ran afoul of state and federal rules governing discovery. (*Id.* at 343.)

The petitioner does not explain how these materials establish his innocence, but he does assert that he raised this issue in his pro se motion to reopen the post-conviction proceeding. (*Id.* at 350.) There, the petitioner maintained that these materials reflected that the state did not submit all of the victim's clothing to the TBI for testing, and that results from the absent clothing would refute the state's theory that the petitioner shot the victim from a distance. (Doc. No. 16-21 at 2–3.) This, the petitioner implied, supported his theory that the shooting was accidental and/or in self-defense.

Even assuming, without deciding, that this evidence is "new" for actual-innocence purposes,[5] "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395

---

[5] There is a circuit split about the definition of "new evidence" in this context, such that "[s]ome courts treat all evidence as new so long as it was not presented at trial," *Lowery v. Parris*, 819 F. App'x 420, 421 (6th Cir. 2020) (citing *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003)), while "[o]ther courts maintain that evidence is new only if it was unavailable at the time of the trial." *Id.* (citing *Moore v. Quarterman*,

F.3d at 590 (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). Thus, a petitioner convicted of murder cannot use the actual-innocence gateway to review by presenting evidence that the killing was justified or that he should have been convicted of a lesser-degree offense. *See Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006) (explaining that "new evidence" supporting self-defense theory did not show petitioner was "factually innocent of killing [the victim]"); *Taylor v. Winn*, No. 20-1359, 2020 WL 4334125, at *1, 3 (6th Cir. July 13, 2020) (citations omitted) (holding that "reasonable jurists would not debate" that petitioner convicted of first-degree felony murder made no "showing of actual innocence" where "he admitted that he was guilty of at least voluntary manslaughter"); *Brickey v. Smith*, No. 12-14028, 2013 WL 4029050, at *6 (E.D. Mich. Aug. 7, 2013) (collecting cases) ("[N]ewly discovered evidence that would merely lower the degree of offense does not establish an actual innocence claim."). Accordingly, the petitioner does not make a credible claim of actual innocence through Claim 10.A.

Next, in Claim 10.B., the petitioner asserts that he learned trial counsel was unqualified to represent him in November 2016. (Doc. No. 1 at 345–46.) For three reasons, this evidence is also unavailing for the petitioner. First, an attorney's qualifications have no bearing on a petitioner's factual innocence. Second, contrary to the petitioner's assertion (*see* Doc. No. 1 at 345), the minimum experience requirement in Rule 13 of the Supreme Court of Tennessee applies only to capital cases—cases "in which a defendant has been charged with first-degree murder *and* a notice of intent to seek the death penalty . . . has been filed." *See* Tenn. Sup. Ct. R. 13, § 3(a) (emphasis added). The state did not file a notice of intent to seek the death penalty here. And third, "there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind

---

534 F.3d 454, 465 (5th Cir. 2008)). The Sixth Circuit "has not directly addressed the issue but has suggested that 'newly presented evidence [is] sufficient.'" *Everson v. Larose*, Nos. 19-3805, 19-4154, 2020 WL 4920196, at *3 (6th Cir. May 4, 2020) (quoting *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012)).

15

of case." *Bland v. State*, No. W2007-00020-CCA-R3-PD, 2009 WL 910197, at *39 (Tenn. Crim. App. Apr. 3, 2009) (citing *Russell v. State*, 849 So. 2d 95, 122 (Miss. 2003)).

For all of these reasons, the petitioner falls short of the threshold necessary for the court to excuse the procedural default of any of his claims based on newly discovered evidence.

### 3.   Claim 9—Ineffective Assistance of Post-Conviction Counsel

In Claim 9, the petitioner asserts that post-conviction counsel was ineffective in eleven ways. Challenges to a post-conviction counsel's effectiveness are not cognizable as independent claims because they are barred by statute and long-standing precedent. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") (citations omitted). Accordingly, Claim 9 will be denied.

In some circumstances, however, the ineffective assistance of post-conviction counsel may be used to establish the "cause" necessary "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). This is a narrow rule, subject to several limitations, including that it can only serve as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." *Davila*, 137 S. Ct. at 2062–63 (discussing *Martinez*, 566 U.S. 1, and *Trevino v. Thaler*, 569 U.S. 413 (2013)). Thus, as discussed in more detail below, the court will consider the petitioner's assertions of post-conviction ineffectiveness as allegations of cause regarding his defaulted claims of ineffective assistance of counsel.

### B.   Adjudicated Claims

The petitioner exhausted his insufficient-evidence and double-jeopardy claims, as well as one claim of ineffective assistance of trial counsel.

16

## 1.    Claim 3—Insufficient Evidence

The respondent concedes that the petitioner properly presented his insufficient-evidence

claim to the TCCA on direct appeal. (Doc. No. 17 at 9.) The TCCA rejected this claim as follows:

> On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979); Tenn. R. App. P. 13(e).
>
> Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).
>
> In order to convict the appellant of first degree premeditated murder, the State was required to prove beyond a reasonable doubt that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. *See Pike*, 978 S.W.2d at 914–15; *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. *See State v. Gentry*, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).
>
> The appellant contends that the State failed to sufficiently prove premeditation. He argues that in Tennessee, all homicides are presumed to be second degree murder.

17

However, in *State v. Jackson*, 173 S.W.3d 401, 406 (Tenn. 2005), our supreme court clarified that the presumption was based upon common law. The court explained that following the revision of the criminal statutes in 1989, "no presumption is engaged to place a killing within any of the categories of criminal homicide" and that "the presumption is no longer applicable and is, therefore, obsolete." *Id.* at 407.

Moreover, we note that the State's proof reflected that two or three days prior to the shooting, the appellant threatened to kill the victim if the victim did not return the appellant's belongings. Immediately prior to the shooting, two witnesses heard a "commotion" during which the appellant said, "I'm not going to keep telling you about my shit." Thereafter, the appellant shot the unarmed victim. The appellant told police that he shot the victim because the victim was "disrespecting" him. Additionally, Pittman testified that the appellant did not act differently after the shooting. We conclude that the evidence is sufficient to sustain the appellant's conviction of first degree premeditated murder.

*Johnson*, 2012 WL 1071809, at *4–5.

As this excerpt reflects, the TCCA identified and applied the federal standard governing claims for sufficiency of the evidence, as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). "Under *Jackson*, habeas corpus relief is appropriate based on insufficient evidence only where the court finds, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007)). On federal habeas review, this standard "commands deference at two levels": "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* (citing *Parker*, 506 F.3d at 448).

The TCCA's resolution of this claim was reasonable. That is, the petitioner did not dispute that he killed the victim, and, based on the evidence presented at trial, a rational juror could have found beyond a reasonable doubt that the petitioner had the state of mind required to convict him of first-degree murder. This evidence includes Walter Spencer's testimony that, two or three days

before the shooting, the petitioner told the victim, "I want my shit or I'm going to kill you," and that the victim responded, "I'm not giving you anything." *Johnson*, 2012 WL 1071809, at *3. It also includes the testimony of two witnesses who, just prior to the shooting, heard someone outside say, "I'm not going to keep telling you about my shit." *Id.* at *1. One of the witnesses recognized this voice as the petitioner's, and both witnesses heard a single gunshot thereafter. *Id.* Detective Alan Charvis testified that the petitioner said he shot the victim because the victim "disrespected" him. (Doc. No. 16-3 at 124–25.) And Angela Pittman testified that the petitioner's demeanor was normal after the killing—not upset, smiling as usual, giving no indication that something bad had happened. (Doc. No. 16-4 at 45.)

The petitioner argues that the evidence was insufficient because certain witnesses presented by the state testified in a manner that was "not based in fact" and "misrepresent[ed] . . . medical fact[s]," and because Walter Spencer's testimony was a "misrepresentation" of the petitioner's prior statement. (Doc. No. 1 at 21.) But a habeas court considering an insufficient-evidence claim "do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Nali v. Phillips*, 681 F.3d 837, 842 (6th Cir. 2012) (quoting *Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009)). Instead, the court must "decide whether the [TCCA's] decision that the evidence presented at trial was sufficient to support [the petitioner's] conviction . . . was contrary to the Supreme Court's decision in *Jackson*." *Id.* (citing *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011)). And given the evidence discussed above, the TCCA's decision was well within the bounds of reason. Claim 3 will be denied.

### 2.    Claim 4—Double Jeopardy

Next, the petitioner asserts that his convictions for first-degree murder and aggravated burglary violated the constitutional prohibition on double jeopardy because the trial court granted

his motion for a judgment of acquittal on the felony-murder count. (Doc. No. 1 at 23–25.) The petitioner presented this claim to the TCCA on appeal of his state habeas corpus proceedings. *See Jackson*, 2010 WL 4882605, at \*1 (noting the petitioner's argument that "he was subjected to double jeopardy because of" his acquittal of felony murder). The TCCA addressed and rejected this claim on the merits as follows:[6] "The petitioner was not subjected to double jeopardy by the indictment because the charges in the indictment were separate and distinct offenses. There was no violation of double jeopardy principles." *Id.*

This determination was clearly reasonable. The Double Jeopardy Clause of the Fifth Amendment "provides that no person may be 'twice put in jeopardy' 'for the same offence.'" *Gamble v. United States*, 139 S. Ct. 1960, 1963–64 (2019). This Clause "protects individuals not only from successive trials, but also prohibits multiple punishments for the same offense." *United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir. 2006) (citations omitted). "However, 'a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause.'" *Id.* (quoting *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1981)); *see also United States v. Willis*, 981 F.3d 511, 514 (6th Cir. 2020) (quoting *Gamble*, 139 S. Ct. at 1965) ("This Clause, however, does not protect individuals from being twice prosecuted 'for the same conduct or actions,' but instead from being twice prosecuted 'for the same offence.'").

---

[6] The TCCA also held that "a claim of double jeopardy is not cognizable in a [state] habeas corpus proceeding." *Johnson*, 2010 WL 4882605, at \*1 (citing *Claypole v. State*, No. M1999-02591-CCA-R3-PC, 2001 WL 523367, at \*2 (Tenn. Crim. App. May 16, 2001)). In other words, in addition to addressing the substance of the petitioner's claim, the TCCA invoked a "state procedural bar" to review. *See Hanna v. Ishee*, 694 F.3d 596, 607 (6th Cir. 2012) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)). Accordingly, this claim may be considered "procedurally defaulted [because it was] dismissed on 'independent and adequate' state law grounds." *See Davis v. Freeman*, No. 1:15-cv-208, 2018 WL 1545739, at \*15 n.5 (M.D. Tenn. Mar. 29, 2018) (quoting *Coleman*, 501 U.S. at 734–35) (considering the Tennessee state court's holding that a claim is "not cognizable in state habeas proceedings" as a proper basis to find procedural default). Faced with alternative substantive and procedural state-court holdings, however, this court "may, but [is] not required to, reach the merits of the claim on habeas review." *Hanna*, 694 F.3d at 607 (citing *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991)). The court elects to reach the merits.

20

That is what occurred here. The petitioner was subjected to a single prosecution, and the trial court's acquittal on the felony-murder count prior to the jury's finding of guilt on the separate and distinct first-degree murder and aggravated burglary counts does not raise double jeopardy concerns. To the extent that the petitioner believes the resolution of these counts was inconsistent, even assuming that to be true for the sake of argument, the United States Supreme Court "has held that inconsistent verdicts do not present a constitutional problem." *Tackett v. Trierweiler*, 956 F.3d 358, 372 (6th Cir. 2020) (citing *Harris v. Rivera*, 454 U.S. 339, 345 (1981)). Thus, "[i]nconsistency in a verdict is not a sufficient reason for setting it aside" on federal habeas review. *Longwell v. Arnold*, 371 F. App'x 582, 589 (6th Cir. 2010) (quoting *Harris*, 454 U.S. at 345). For all of these reasons, Claim 4 is will be denied.

### 3.      Claim 6.H—Ineffective Assistance of Trial Counsel

In Claim 6.H, the petitioner asserts that trial counsel was ineffective for failing to interview the state's witnesses before trial, resulting in inadequate cross-examination. (Doc. No. 1 at 99.) The respondent concedes that the petitioner exhausted this claim on post-conviction appeal. (Doc. No. 17 at 14.)

The federal law governing the adequacy of a criminal defendant's representation is defined in *Strickland v. Washington,* 466 U.S. 668 (1984). *Premo v. Moore*, 562 U.S. 115, 121 (2011). The TCCA correctly identified this standard before rejecting this claim on the merits. *Johnson*, 2017 WL 809883, at *6–7.

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

Case 3:18-cv-00539   Document 24   Filed 07/30/21   Page 21 of 41 PageID #: 2671

Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Id.* at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Further, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Pinholster*, 563 U.S. at 190).

The TCCA rejected the petitioner's inadequate-cross-examination claim as follows:

In the case under submission, the Petitioner contends that Counsel was ineffective in his cross-examination of the medical expert witnesses and the TBI agents. We agree with the post-conviction court that the Petitioner has not met his burden of proof. The witnesses who testified at the post-conviction hearing agreed that Counsel did not approach them pretrial to ask hypothetical questions and that, had Counsel done so, they would have answered any questions. They also said that generally they did not speak with the State's attorney or defense attorneys pretrial. Counsel said that he did not approach the witnesses because the theory of the case was that the shooting was accidental and that he intended to present this theory through the Petitioner's testimony. The Petitioner testified at trial and told the jury that the shooting was an accident.

The Petitioner presented no evidence at the post-conviction hearing that Counsel was ineffective for not speaking with the witnesses before trial. He further presented no evidence at the post-conviction hearing about how any hypothetical questions posed to the jury would have changed the outcome of the trial. The facts

22

of the case remain that the Petitioner threatened to kill the victim three days before he shot him. Before he died, the victim identified the Petitioner as the shooter. The Petitioner gave a statement to police saying that he shot the victim for disrespecting him. We conclude that, considering the weight of the evidence, the Petitioner cannot prove that he was prejudiced by Counsel's failure to ask the witnesses about the location of the gunshot wound or the path of the bullet. The Petitioner is not entitled to relief.

*Johnson*, 2017 WL 809883, at *8.

The TCCA's prejudice ruling was not unreasonable. The petitioner points to six specific state witnesses who trial counsel should have interviewed before trial to prepare for cross-examination: Adele Lewis, Lawrence Nolan, Steve Scott, Lashae Spencer, Sergeant Michael, and Chad Koyama. (Doc. No. 1 at 99.) However, none of these six individuals testified at the post-conviction evidentiary hearing. Rather, the petitioner called and questioned four TBI witnesses who testified at trial: Laura Hodge, Linda Littlejohn, Elizabeth Reid, and James Davis. (Doc. No. 16-13 at 28–37.) At trial, these witnesses testified regarding the respective results of: a gunshot residue test of the petitioner's hands; a shoe print analysis of the victim's door; a latent print analysis of a rifle, magazine, cartridges, and casings; and a gunshot residue test of the petitioner's clothing. (Doc. No. 16-3 at 82–85, 88–91, 94–98, 100–05.) Trial counsel did not cross-examine these witnesses at trial, except for eliciting testimony from Reid that, based on the latent print analysis, there was "no way to tell who touched" the gun used to shoot the victim. (*Id.* at 86, 91, 98, 105.) And at the evidentiary hearing, these four witnesses testified only that trial counsel did not discuss the case with them before trial, and that they would have done so if asked. (Doc. No. 16-13 at 28–37.)

The petitioner did not present any evidence to show what affect a different strategy of cross-examination at trial would have had on the result of the trial proceeding. Accordingly, it was not unreasonable for the TCCA to determine that the petitioner failed to demonstrate prejudice

resulting from trial counsel's allegedly ineffective cross-examination. *See Hutchison v. Bell*, 303 F.3d 720, 748–49 (6th Cir. 2002) (citations omitted) ("[A] petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material."); *Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("In the absence of any evidence showing that [petitioner's proffered mitigating witnesses] would have offered specific favorable testimony, [petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence."). Claim 6.H will therefore be denied.

## C. Procedurally Defaulted Claims

The petitioner's remaining claims are procedurally defaulted without cause. This includes the petitioner's claims of trial court error and prosecutorial misconduct, as well as numerous claims of ineffective assistance of pre-trial counsel, trial counsel, and post-trial counsel.

### 1. Claim 1—Trial Court Errors

In Claim 1, the petitioner asserts that the trial court erred in four ways. (Doc. No. 1 at 474–75 (Claim 1.A); *id.* at 429–30 (Claim 1.B); *id.* at 417–18 (Claim 1.C); *id.* at 423 (Claims 1.D).) The petitioner did not present these claims to the TCCA through his state habeas corpus proceedings, on direct appeal, or through his post-conviction proceedings. And based on Tennessee's "one-petition" limitation on post-conviction relief, no state court remedies remain for these claims. *See* Tenn. Code Ann. § 40-30-102(c).[7] Accordingly, the petitioner's claims of trial court error are procedurally defaulted.

---

[7] There are three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, but none apply here. *See Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)) ("A [Tennessee] prisoner may file a motion to reopen his first post-conviction petition only if his claim stems from a newly established constitutional right that applies retroactively, relies on scientific evidence that he is actually innocent, or involves a sentence enhanced because of a previous conviction that has been declared invalid.").

24

As cause to excuse this default, the petitioner asserts that he received ineffective assistance of counsel on direct appeal. (Doc. No. 1 at 479.) "Ineffective assistance of counsel can constitute cause for a procedural default." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Carrier*, 477 U.S. at 492). But "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." *Id.* (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)). That is the case here, as the petitioner did not exhaust a claim that appellate counsel was ineffective for failing to raise the four trial court errors asserted in Claim 1. For this reason, Petitioner "cannot rely on ineffective assistance of counsel to establish cause to excuse his procedural default," *id.*, and this claim is not subject to further review.

### 2. Claim 2—Prosecutorial Misconduct

The petitioner next asserts that the state committed prosecutorial misconduct in three ways, and the court will address each claim in turn.

### a. Withholding Exculpatory Evidence

In Claim 2.A, the petitioner asserts that the state knowingly withheld exculpatory medical records. (Doc. No. 1 at 388–90, 493.) *Brady v. Maryland* "requires the prosecution to disclose all material exculpatory evidence to the defendant before trial." *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011) (citing *Brady*, 373 U.S. 83 (1963)). "To succeed on a *Brady* claim, a petitioner must establish: (1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice." *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (citing *Strickland v. Greene*, 527 U.S. 263, 281–82 (1999)). "To show cognizable prejudice, [the petitioner] must establish that the suppressed evidence is material—that 'there is a reasonable probability that, had the evidence been disclosed to the

25

defense, the result of the proceeding would have been different.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

The petitioner did not exhaust a *Brady* claim in state court. And as with his claims of trial court error, the petitioner cannot rely on appellate counsel's asserted ineffectiveness as cause to overcome this failure to exhaust (*see* Doc. No. 1 at 394, 495) because the petitioner did not exhaust such a claim of appellate ineffectiveness in state court either. However, because the "cause and prejudice standard" of a procedural default analysis "tracks the last two elements of a *Brady* claim"—suppression and materiality—the Sixth Circuit has explained that it may be appropriate for courts to "focus [their] attention on the merits of [a *Brady*] claim with the understanding that [a] decision on the merits resolves any issues as to procedural default." *Akrawi v. Booker*, 572 F.3d 252, 261 (6th Cir. 2009) (quoting *Bell v. Bell*, 512 F.3d 223, 231 n.3 (6th Cir. 2008) (en banc)). The court takes that approach here, but as explained below, Claim 2.A nonetheless does not entitle the petitioner to relief.

The petitioner asserts that the state withheld the victim's Emergency Medical Service and Gateway Hospital records (including x-ray results), and the county medical examiner report regarding the circumstances of the victim's death ("CME report"). (Doc. No. 1 at 389.) The petitioner argues, without explanation, that the suppression of these materials deprived him of the ability to prepare a defense, prepare for cross-examination of state witness, and prepare for direct examination of defense witnesses. (*Id.* at 389–90.) Thus, the petitioner's argument in support of this claim is wholly conclusory, as he "has not shown how he would have used the [allegedly] withheld evidence to conduct further discovery, to question witnesses at trial differently, or to further develop his theory of the case." *See Hogan v. Welch*, No. No. 4:08CV2539, 2010 WL 300798, at *4–5 (N.D. Ohio Jan. 19, 2010) (rejecting habeas claim where petitioner did not

demonstrate "that the evidence was favorable, aside from asserting that he found it to be pertinent to his defense").

Moreover, the victim's Emergency Medical Service and Gateway Hospital records are not attached to the Petition, and the petitioner does not attempt to describe them in any detail. Thus, any consideration of their favorability or materiality is purely speculative, and they cannot form the basis of a *Brady* claim. *See Hendricks v. Lindamood*, No. 3:18-CV-00094-JRG-HBG, 2019 WL 5558571, at *7 (E.D. Tenn. Oct. 28, 2019) (citing *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)) ("[Petitioner] has failed to include any challenged evidence as part of his petition, and therefore, he has failed to sustain his burden of proving that evidence was not properly disclosed to him.").

Finally, although the CME report is attached to the Petition (Doc. No. 1 at 319–21), the record reflects that it was not suppressed. This report was within a discovery packet faxed to trial counsel about two weeks before trial in August 2009, who in turn provided it to post-conviction counsel in July 2016. (*See id.* at 317–18); *Stoketz v. Ishee*, 892 F.3d 175, 206 (6th Cir. 2018) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)) ("[A] *Brady* violation does not occur when 'the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source.'"). To the extent that the petitioner is arguing that the state did not provide the CME report to trial counsel sufficiently in advance of trial, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Hogan*, 402 F. App'x 54, 58 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008)) (finding that disclosure of *Brady* material "at the close of the first day of trial [did] not constitute suppression").

For all of these reasons, Claim 2.A will be denied.

**b.        Knowingly Presenting False Testimony**

In Claim 2.B, the petitioner asserts that the state knowingly presented false testimony regarding the location and size of the victim's wound. (Doc. No. 1 at 352–53.) "A conviction obtained by the knowing use of perjured testimony must be set aside if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.* at 583–84 (citations omitted). "Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury." *Peoples v. Lafler*, 734 F.3d 503, 516 (6th Cir. 2013) (citing *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010)).

As with the petitioner's general *Brady* claim, however, the petitioner did not exhaust this claim in state court, and he cannot rely on appellate counsel's asserted ineffectiveness as cause (*see* Doc. No. 1 at 377) because he did not exhaust such a claim of appellate ineffectiveness. And as with a standard *Brady* claim, it is sometimes preferable to resolve issues regarding the procedural default of a false-testimony claim by addressing the merits. *See Brooks*, 626 F.3d at 894–96 (taking this approach). But given the specific facts here, it is clear that the petitioner has not demonstrated the cause necessary to obtain review of this claim.

Claim 2.B is premised entirely on the CME report. (*See* Doc. No. 1 at 353.) As explained above, the state faxed the CME report to the petitioner's trial counsel about two weeks before trial. Thus, the petitioner cannot rely on the state's supposed suppression of the report as cause to excuse

28

the default of this claim. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (explaining that a petitioner "shows 'cause'" for the procedural default of a *Brady* claim "when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence").

Notwithstanding this default, Claim 2.B also fails on the merits for the straightforward reason that the challenged testimony was not actually false. The petitioner argues that the CME report "prove[d] false" the trial testimony of three witnesses: Dr. Adele Lewis, who performed the autopsy ordered by the county medical examiner; Larry Nolan, an emergency medical services employee who responded to the scene of the victim's shooting; and Steve Scott, a TBI employee who conducted testing that involved an examination of the victim's sweatshirt. (Doc. No. 1 at 353.)

The CME report, however, does not undermine the credibility of this testimony in any way. On the report, the probable cause of death is listed as "[g]unshot wound to torso" (*id.* at 356), the narrative summary of circumstances surrounding death states that the victim "was reportedly shot in the chest" (*id.* at 357), and the brief history section of the county medical examiner's "Order for Autopsy" states "[gun shot wound] to chest." (*Id.* at 358.) The report also includes two sections that are not filled out: a "Description of Body" section, and a "Marks & Wounds" section, with a front and back diagram of a human body. (*Id.* at 356.)

Dr. Lewis testified, consistent with the CME report, that she found the manner of death to be a "gunshot wound to the torso." (Doc. No. 16-3 at 51.) She also testified that the bullet "entered the body just below the left nipple" (*id.* at 51–52), which the petitioner contends was "proven false" because the "Marks & Wounds" section of the report was not completed. (Doc. No. 1 at 353.) Nolan testified, consistent with the CME report, that the victim "had been shot in the chest." (Doc. No. 16-2 at 114.) And Nolan testified, consistent with Dr. Lewis's autopsy findings, that he "believe[d]" the "gunshot wound [was] right below the left nipple." (*Id.*) Finally, Scott testified,

upon examination of the victim's sweatshirt, that there was a hole "fairly centered in the chest or upper abdomen, somewhat in the center of the torso of where the sweater would ride on the body." (Doc. No. 16-3 at 115.) Thus, all three witnesses testified based on their personal observations, and the uncompleted portions of the CME report provide no basis to question the credibility of this testimony. To the extent the petitioner is attempting to assert that these witnesses described the victim's wound differently from one another, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Peoples*, 734 F.3d at 516 (quoting *Brooks*, 626 F.3d at 894).

For all of these reasons, Claim 2.B will be denied.

### c.    Failing to Complete the Record on Direct Appeal

In Claim 2.C, the petitioner asserts that the state committed prosecutorial misconduct by not submitting the victim's medical records or the complete statement of state witness Walter Spencer to the TCCA on direct appeal. (Doc. No. 1 at 482, 486–87.) The petitioner did not present these claims to the TCCA at any point, and he can no longer do so because they do not fall into a category of claims supporting a motion to reopen post-conviction proceedings. *See* Tenn. Code Ann. § 40-30-102(c); *Hodges*, 727 F.3d at 530 (citing *Fletcher*, 951 S.W.2d at 380–81). The petitioner again points to the alleged ineffectiveness of counsel on direct appeal as cause to excuse this default (Doc. No. 1 at 495), but he did not exhaust such a claim of appellate ineffectiveness. Accordingly, Claim 2.C is procedurally defaulted without cause and is not subject to further review.

### 3.    Claims 5, 6, 7—Ineffective Assistance of Counsel

The remaining claims are for ineffective assistance of counsel. This includes: all of Claim 5, asserting that pre-trial counsel was ineffective in four ways; most of Claim 6, asserting that trial

counsel was ineffective in ten ways; and all of Claim 7, asserting that post-trial counsel was ineffective in four ways. The petitioner defaulted these claims by failing to present them to the TCCA on post-conviction appeal. *See Johnson*, 2017 WL 809883, at *6 (asserting only that trial counsel "failed to effectively cross-examine multiple witnesses").

As cause to overcome this default, the petitioner asserts that he received ineffective assistance of counsel on direct appeal. (Doc. No. 1 at 414 (cause for Claims 6.J and 6.K).) But because the petitioner did not exhaust a claim of appellate ineffectiveness, he cannot rely on such an assertion to obtain review of his claims. *See Hodges*, 727 F.3d at 530 (quoting *Edwards*, 529 U.S. at 453) ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.").

The petitioner also asserts that he received ineffective assistance during his post-conviction proceedings. (Doc. No. 1 at 271, 313 (cause for Claims 5 and 7); *supra* Section V.A.3 (stand-alone claims).) And under *Martinez v. Ryan*, an assertion of post-conviction ineffectiveness may act as the cause necessary to excuse the default of certain claims. But for the following reasons, the petitioner cannot rely on *Martinez* for that purpose here.

### a.     Ineligible Under *Martinez* Due to Type of Underlying Claim

*Martinez* can serve as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." *Davila*, 137 S. Ct. at 2062–63 (discussing *Martinez*, 566 U.S. 1, and *Trevino*, 569 U.S. 413). Claim 7 is a claim of *post*-trial counsel, Gregory Smith. The court appointed Smith to represent the petitioner after trial and sentencing (*see* Doc. No. 16-1 at 35–36, 50–52 (judgments filed September 3 and November 5, 2009); *id.* at 55 (appointment order filed January 14, 2010)), and the petitioner asserts that Smith was ineffective for omitting four issues from the motion for new trial. (Doc. No. 1 at 199, 215, 220, 226.) "Once a defendant has been

31

found guilty and sentenced, he is no longer a 'presumptively innocent defendant' facing 'the danger of conviction,' about whom *Martinez* is concerned. *See Martinez*, 566 U.S. at 12; *Davila*, 137 S. Ct. at 2066–67. Accordingly, *Martinez* does not apply to claims of post-trial ineffectiveness." *Rogers v. Westbrooks*, 3:13-cv-00141, 2019 WL 1331035, at *101 (M.D. Tenn. Mar. 25, 2019) (citing *Milam v. Davis*, 733 F. App'x 781, 784, 786 (5th Cir. 2018)) (holding that *Martinez* does not apply to claims of ineffectiveness at the motion-for-new-trial stage of proceedings); *see also Reid v. United States*, No. 18-5432, 2018 WL 11303655, at *2 (6th Cir. Aug. 28, 2018) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 61, 64 (2013)) ("The Supreme Court has never held that a hearing on a motion for a new trial is a critical stage of a criminal proceeding, however, and specifically declined to do so in *Marshall v. Rodgers*, stating that '[t]he Court expresses no view on the merits of the underlying Sixth Amendment principle' that a 'post-trial, preappeal motion for a new trial is a critical stage of the prosecution.'").

Because the petitioner has not demonstrated a viable cause to excuse the default of his claims of post-trial ineffectiveness, Claim 7 is not subject to further review.

### b.     Ineligible Under *Martinez* Due to Default on Appeal

*Martinez* also "does not concern attorney errors in . . . appeals from initial-review collateral proceedings." 566 U.S. at 16 (citing *Coleman*, 501 U.S. at 754 and *Carrier*, 477 U.S. at 488). "It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* Accordingly, ineffective assistance of post-conviction counsel cannot act as cause to excuse the default of a claim that is rejected by the post-conviction court, but not raised on appeal. *See Atkins*, 792 F.3d at 661 (emphasis added) (quoting *West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015)) ("[A]ttorney error at state post-conviction

32

appellate proceedings cannot excuse procedural default."). Four claims of trial counsel ineffectiveness are subject to dismissal for this reason.

In Claims 6.E, 6.F, and 6.I, respectively, the petitioner asserts that trial counsel was ineffective for failing to investigate evidence related to the victim's wound, investigate and obtain the victim's medical records to prepare for trial, and call witnesses to elicit testimony regarding the victim's injury. (Doc. No. 1 at 66, 82, 100 (Claim 6.E); *id.* at 95 (Claim 6.F); *id.* at 113–14 (Claim 6.I).) The petitioner raised these claims in the pro se and amended post-conviction petitions, as well as at the post-conviction hearing. (Doc. No. 16-12 at 10–11, 13, 57–58 (petitions); Doc. No. 16-13 at 18–19, 21, 24 (hearing).) The court rejected them. (Doc. No. 16-12 at 121 (Claim 6.E); *id.* at 122–23 (Claim 6.F); *id.* at 124–25 (Claim 6.I).) And as explained above, the petitioner did not appeal the denial of these claims to the TCCA. Accordingly, the petitioner cannot rely on post-conviction counsel's asserted ineffectiveness to excuse the default of these claims.

Similarly, in Claim 6.G, the petitioner asserts that trial counsel was ineffective for failing to use the victim's dying declaration to support the petitioner's defense. (Doc. No. 1 at 87.) The petitioner maintains that the victim's declaration "support[ed] [the] petitioner['s] account of where [the] victim['s] . . . injury [was located]." (*Id.*) Although this claim was not clearly spelled out in the pro se or amended post-conviction petition, the petitioner clearly raised it at the hearing. (Doc. No. 16-13 at 15 ("[M]y attorney failed to use [the victim's] own words to advocate for me . . . . [U]nder the dying declaration motion from the State, my attorney had the opportunity to use that evidence . . . of [the victim's] word on my behalf to establish some basic facts about the . . . gunshot wound.").) The court rejected it, either by finding that the petitioner failed to demonstrate prejudice resulting from trial counsel's handling of the victim's wound location (Doc. No. 16-12 at 121 ("Regarding the wound location and bullet path, the petitioner has not presented any evidence,

other than his own assertion that an upper-body gunshot wound suggests an intentional shooting while a lower-body wound suggests an accidental one, to substantiate his claims that different evidence regarding wound location and bullet path would have supported an accidental shooting theory.")), or by denying relief as to any unlisted issues for which the petitioner did not present evidence. (*See id.* at 105 n.2.) Either way, the petitioner did not include this claim is his post-conviction appeal, so *Martinez* does not apply. *See Atkins*, 792 F.3d at 661 (holding that *Martinez* does not apply to a claim "not expressly identif[ied]" in a post-conviction petition, raised at a hearing, rejected on the merits, and not appealed).

In sum, Claims 6.E, 6.F, 6.G, and 6.I were defaulted on post-conviction appeal, so the petitioner cannot rely on *Martinez* to demonstrate the cause necessary to obtain further review.

### c.    Insubstantial Under *Martinez*

Finally, the court is left with Claim 5, asserting that pre-trial counsel was ineffective in four ways, and part of Claim 6, asserting that trial counsel was ineffective in six ways. To determine whether the petitioner has demonstrated cause for the default of these claims under *Martinez*, the court considers "(1) whether state post-conviction counsel was ineffective; and (2) whether [the petitioner's] claims of ineffective assistance of counsel were 'substantial.'" *Atkins*, 792 F.3d at 660 (citations omitted). "A substantial claim is one that has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). All of the petitioner's remaining claims are insubstantial.

34

A significant number of these claims are "wholly without factual support." In Claims 5.A, 5.B, and 5.D, respectively, the petitioner asserts that pre-trial counsel was ineffective for failing to file a motion for discovery (Doc. No. 1 at 273), file a motion for exculpatory evidence (*id.* at 302), and communicate with the petitioner. (*Id.* at 309). And in Claims 6.B, 6.C, and 6.D, respectively, the petitioner asserts that trial counsel was ineffective for failing to file a motion for a bill of particulars (*id.* at 37), file a motion for discovery (*id.* at 38), and review and provide the petitioner with a copy of the discovery material. (*Id.*) The petitioner essentially argues that these failures by pre-trial and trial counsel prevented him from adequately preparing for trial and formulating a defense strategy. (*Id.* at 37–38, 273, 302, 309.) But the petitioner fails to establish prejudice for these claims because he does not explain with any particularity how these asserted failures specifically affected the outcome at trial.[8] *See Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003) (holding that habeas petitioner failed to establish prejudice based on bare allegation of failure to communicate with no showing of "how additional time spent with counsel could have altered the outcome of his trial"). In other words, these five claims rest on "merely conclusory allegations of ineffective assistance" that "are insufficient to state a constitutional claim." *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (citing *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998)). Accordingly, Claims 5.A, 5.B, 5.D, 6.B, 6.C, and 6.D are insubstantial.

---

[8] In the reply, the petitioner argues that pre-trial counsel's failure to communicate prevented him from properly attacking the admissibility of his statements to police after his arrest. (Doc. No. 22 at 87–89.) But the petitioner unsuccessfully attacked the admissibility of these statements through a jury-out hearing during trial (Doc. No. 16-4 at 5–36), and the petitioner's assertion that earlier communication with counsel would have led to a different result is entirely conclusory. The reply also argues that trial counsel's failure to file a bill of particulars "allowed the prosecution a whole county (Montgomery) to present a speculative situation of when and where the murder occurred during trial." (Doc. No. 22 at 20.) But the indictment included the date of the charged crimes (Doc. No. 16-1 at 4–5), and the petitioner was well aware of the charged crimes' location if for no other reason than he discussed the circumstances of the shooting with the police when he admitted shooting the victim shortly after his arrest. *See Johnson*, 2017 WL 809883, at *2.

The four remaining claims are meritless. In Claim 5.C, the petitioner asserts that pre-trial counsel was ineffective for failing to investigate the victim's clothing. (Doc. No. 1 at 306.) If pre-trial counsel had submitted the victim's clothing for forensic testing, the petitioner argues, it would have established that the shooting occurred at close range, thereby supporting the petitioner's trial testimony that the shooting was the result of a struggle. (*Id.*) But as discussed above, *supra* Section V.C.2.b, TBI forensic analysis Steve Scott tested the victim's sweatshirt. (Doc. No. 16-3 at 114.) Scott attempted to determine the distance between the gun and the shirt at the time the shot was fired. (*Id.*) He did so by "performing a series of tests that help to reveal any residues" present on the shirt. (*Id.*) The testing "did not reveal any residues that [were] sufficient" to determine a shooting distance. (*Id.*) But if the shooting had occurred at a "very close distance[]," Scott testified, there would have been residues deposited on the shirt. (*Id.* at 115–16.) The petitioner has not provided any basis to conclude that Scott's testing was not reliable, nor has the petitioner specified what additional testing should have been performed on the victim's clothing. The petitioner's assertion that unspecified additional testing would have supported his close-range theory is entirely speculative. Accordingly, the petitioner's claim that pre-trial counsel was ineffective for failing to secure such testing is insubstantial.

In Claim 6.A, the petitioner asserts that trial counsel was ineffective for failing to inform the court that his absence of his trial experience made him "ineligible" to represent the petitioner under Rule 13 of the Supreme Court of Tennessee. (Doc. No. 1 at 30–31.) This claim is based on a false premise. As discussed above, *supra* Section V.A.2, Rule 13's minimum experience requirement did not apply in the petitioner's case because the state did not seek the death penalty. *See* Tenn. Sup. Ct. R. 13, § 3(a) (emphasis added) (stating that Rule 13 applies only to a "case in which a defendant has been charged with first-degree murder and a notice of intent to seek the

death penalty . . . has been filed"). Moreover, the court cannot presume ineffectiveness based on an asserted lack of experience. *See Bland*, 2009 WL 910197, at *39 (citing *Russell*, 849 So. 2d at 122) ("[T]here is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case."). Accordingly, Claim 6.A is not substantial.

In Claim 6.J, the petitioner asserts that trial counsel was ineffective for failing to object to when the trial court constructively amended the indictment by giving a jury instruction regarding assault based upon fear. (Doc. No. 1 at 397, 404–05.) Although this claim requires some background explanation, it is plainly without merit.

"A constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Freeman v. Moore*, 303 F. App'x 285, 291 (6th Cir. 2008) (quoting *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003)). "Although a state prisoner petitioning for habeas relief is not protected by the federal guarantee of charge by indictment, he still has a 'due process right to be informed of the nature of the accusations against him.'" *Halvorsen v. White*, 746 F. App'x 489, 495 (6th Cir. 2018) (quoting *Lucas v. O'Dea*, 179 F.3d 412, 417 (6th Cir. 1999)).

Here, the indictment charged the petitioner with first-degree murder, felony murder, and aggravated burglary. (Doc. No. 16-1 at 4.) One way to commit aggravated burglary is by entering a habitation "and commit[ing] or attempt[ing] to commit a felony, theft or assault." Tenn. Code Ann. §§ 39-14-402(a)(3), 39-14-403(a). The aggravated burglary count in the indictment tracked this language by alleging that the petitioner "enter[ed] the habitation of Michael Zabik . . . and did then commit a felony or an assault, in violation of TCA 39-14-403." (Doc. No. 16-1 at 4.) After

trial counsel moved for a judgment of acquittal, the court ruled that the case could not be presented to the jury for a verdict based on the "felony" prong of this count. (Doc. No. 16-4 at 83–84.) Instead, aggravated burglary could be presented based only on the allegation that the petitioner "entered the habitation and committed an assault." (*Id.* at 84, 88.)

The petitioner takes issue with what happened next. Because there are three types of simple assault under Tennessee law, *see* Tenn. Code Ann. § 39-13-101(a), the court sought to clarify which type of assault to present to the jury. (*See* Doc. No. 16-4 at 88.) The state explained that its "theory on the assault" was consistent with the type whereby a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2); (Doc. No. 16-4 at 89.) The court therefore ruled that aggravated burglary would "go to the jury on assault based upon fear." (Doc. No. 16-4 at 92.)

The petitioner argues that this ruling constructively amended the indictment because the indictment did not allege this specific type of assault. (Doc. No. 1 at 405.) However, the Tennessee Supreme Court has specifically rejected this argument by holding that it is unnecessary for an indictment alleging the commission of assault to "specifically allege which . . . means or theories the State was relying upon to prove the" assault. *State v. Hammonds*, 30 S.W.3d 294, 298 (Tenn. 2000); *see also id.* at 300 ("[A]n indictment need not allege the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused."). And to "satisfy federal due process requirements," a state-court indictment need only "cite[] the relevant statutes under which [the defendant] was charged." *Lambert v. Hampton*, No. 19-5117, 2019 WL 11854774, at *3 (6th Cir. Apr. 17, 2019) (citing *Williams v. Haviland*, 467 F.3d 527, 535–36 (6th Cir. 2006)). The indictment did so here. (*See* Doc. No. 16-1 at 4–5.)

In sum, the petitioner has not demonstrated that the trial court erred by ruling that it would instruct the jury regarding "assault based on fear" as a component of the aggravated burglary charge. And because this ruling did not deprive the petitioner of his right to be informed of the nature of the accusations against him, trial counsel was not ineffective for failing to argue that this ruling constructively amended the indictment. Claim 6.J is not substantial.

Finally, in Claim 6.K, the petitioner asserts that trial counsel was ineffective for failing to object to an incomplete prior statement by state witness Walter Spencer. (Doc. No. 1 at 407–08.) Before the state called Spencer to testify at trial, the court heard Spencer's testimony outside the presence of the jury to address anticipated legal issues. (Doc. No. 16-3 at 11–15.) The petitioner challenges two aspects of this jury-out testimony, and the court will address each in turn.

First, Spencer testified that he heard the petitioner make a death threat to the victim two or three days before the killing. (*Id.* at 12–13, 16–20.) Specifically, Spencer testified that the petitioner said to the victim, "Give me my shit; if you ain't I'm gonna kill you." (*Id.* at 18.) The court allowed Spencer to give this testimony to the jury[9] based on the "state of mind exception to the hearsay rule." (*Id.* at 25.) This exception "provides for the admission of a 'declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health).'" *State v. Trusty*, 326 S.W.3d 582, 603 (Tenn. Crim. App. 2010) (quoting Tenn. R. Evid. 803(3)). "Declarations of mental state can also be used to prove the declarant's past or future mental state." *Id.* (citing Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 8.08[4] (5th ed. 2005)). The petitioner argues that trial counsel was ineffective for "agree[ing] to allow this damaging evidence into the trial" (Doc. No. 1 at 407), and it is true that trial counsel did not object to this ruling. (Doc. No. 16-3 at 13 (agreeing "that [the] threat

_____

[9] Spencer's testimony in front of the jury was consistent with his jury-out testimony. (Doc. No. 16-3 at 41 ("[The petitioner] said I want my shit or I'm gonna kill you.").)

39

[was] going to get in").) But the petitioner does not explain how the court erred by applying the state of mind exception, nor does he any identify any particular objection trial counsel should have raised that would have resulted in the court excluding the challenged testimony. Accordingly, the petitioner's assertion that counsel was ineffective in this regard is meritless.

Second, Spencer also testified that, about a day after the petitioner made the threat discussed above, the victim told Spencer that "everything was cool," which Spencer understood to mean that the victim was not afraid of the petitioner. (*Id.* at 22, 25–26.) The court did not restrict trial counsel from eliciting this testimony in front of the jury (*id.* at 26), but counsel did not do so. (*Id.* at 47.) The petitioner argues that trial counsel was ineffective for "agree[ing] with the . . . District Attorney not to allow [this] favorable" testimony "to be introduced to the jury." (Doc. No. 1 at 407.) To the extent the petitioner is implying that counsel had an agreement with the prosecutor to undermine the petitioner's case, such an allegation is wholly unsupported and the court gives it no weight. *See Strickland*, 466 U.S. at 689 (citations omitted) ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," but "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Simply put, the petitioner's conclusory assertion of error for failure to elicit this testimony is insufficient to overcome the strong presumption of adequate representation. *See Burt*, 571 U.S. at 23 (citing *Strickland*, 466 U.S. at 690) ("Counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"). Moreover, the petitioner does not explain how this testimony—that the victim did not fear the petitioner a day or two before he

died—would have resulted in a different outcome at trial. Accordingly, the petitioner's assertion that trial counsel was ineffective in this regard is without merit, and Claim 6.K is insubstantial.

## VI. Conclusion

For these reasons, the petitioner is not entitled to relief under Section 2254 and this action will be dismissed. The petitioner's request for the appointment of counsel (Doc. No. 1 at 15) will be denied as moot.

Because this constitutes a "final order adverse to" the petitioner, the court must grant or deny a certificate of appealability. Habeas Rule 11(a). A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated throughout the court's analysis, the court concludes that the petitioner has not satisfied these standards and will deny a certificate of appealability.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge

41